UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-81139-CIV-HURLEY/HOPKINS

LINDA LEWIS,

      Plaintiff,

vs.

CITY OF WEST PALM BEACH, et al.,

      Defendants.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the court upon plaintiff's motion for summary judgment [DE # 97] and defendants' motions for summary judgment [DE # 91, 94, 95, 96, 98]. For the reasons expressed below, the court will deny plaintiff's motion and grant defendants' motions.

### BACKGROUND

This is a Section 1983 and wrongful-death action against the City of West Palm Beach and five of its police officers. The facts given below are drawn from the pleadings and record evidence and, in the resolution of each motion, have been viewed in the light most favorable to the non-moving party. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

At around 1:19 a.m. on October 19, 2005, concerned bypassers calling 911 reported a man in need of assistance near the intersection of 45th Street and Broadway in West Palm Beach. Defendant Officer Raymond Shaw arrived at the scene to find Donald George Lewis shirtless and apparently distraught, stumbling onto the road and attemping to flag down passing vehicles. Lewis had been using cocaine earlier in the night. Officer Shaw exited his squad car and confronted Lewis.

Officer Shaw asked Lewis "what's up, buddy?" and directed Lewis to lie down on the side of the road.  Lewis, breathing heavily and grunting incoherently, did so.  Officer Shaw asked Lewis "how much coke did you smoke, man?" to which Lewis replied "I didn't do nothing."

Officer Shaw asked Lewis to relax, but Lewis did not.  Lewis continued to gesticulate wildly and thrash about on the shoulder of 45th Street.  Lewis intermittently obeyed Officer Shaw's direction to stay down on the side of the road but did not remain there.  Eventually Lewis stood and ran, arms raised and yelling unintelligibly, across 45th Street.  Vehicles in the westbound lane of 45th Street were forced to stop in order to avoid hitting Lewis.  Officer Shaw caught up to Lewis in the westbound lane and first attempted to pull Lewis off the road, then forced him to the ground in the center of the road.  Lewis resisted Officer Shaw's attempts to subdue him and ignored Officer Shaw's request that he put his hands behind his back.  After a struggle, Officer Shaw was able to manuever Lewis into a prone position.  With his knee on Lewis' lower back, Officer Shaw brought Lewis' hands behind his back and began to handcuff them.

As Officer Shaw was doing so, defendant Officer Robert Leroy Root, III arrived on the scene.  Officer Root placed his knee on Lewis' upper back and neck, between Lewis' shoulder blades.  Lewis continued to groan and grunt audibly, while Officer Shaw and Officer Root pleaded with Lewis to calm down.  Approximately one minute after he began assisting Officer Shaw, Officer Root arose and returned to his squad car to obtain a leg restraint.  While Officer Shaw continued to hold Lewis down in a prone position, defendant Officer Thelton Luke arrived, and together Officer Luke and Officer Root bound Lewis' legs using the leg restraint.  After application of the leg restraint, Officer Shaw stood up.  Lewis continued breathing heavily and groaning.  Officer Shaw suggested that they remove Lewis from the road, and the three officers picked up Lewis by his arms and legs.

2

Lewis apparently attempted to bite Officer Shaw in the shins as Officer Shaw helped carry Lewis out of the road.

The officers placed Lewis on the sidewalk just outside of the road and attempted to put Lewis into a seated position, but Lewis refused to sit up and continued to writhe on the ground.  At this point, defendants Officer Maale and Officer Dunn arrived at the scene, and Officer Shaw briefly placed his knee once again on Lewis' upper back, although less forcefully.  The five officers all stood for a moment, considering what to do.  Then, while Officer Luke and Officer Root kept their knees on Lewis' back, Officer Shaw picked up Lewis' bound legs and pushed them down and forward.  Lewis suddenly became silent and motionless.  The officers then tied Lewis' hands and feet together behind his back in a "hogtied" position.

Officer Maale realized that Lewis had become unconscious and ordered the other officers to move Lewis onto his side.  Officer Root reported that Lewis had a pulse, although Lewis remained non-responsive.  The officers gave first aid to Lewis, including CPR, while waiting for medical assistance to arrive.  The officers continued to observe that Lewis maintained a pulse, but was not breathing.  Paramedics arrived within several minutes and assumed control of Lewis' treatment, but they were unable to resuscitate Lewis.  Lewis was later pronounced dead.

On December 11, 2006, plaintiff Linda Lewis, Donald Lewis' mother, filed this lawsuit.  The suit named as defendants the City of West Palm Beach; the five individual police officers involved in the incident; Langley Productions; and Danny Jeffrey and Zach Ragsdale, two Langley employees.[1]  On October 15, 2007, plaintiff, the City of West Palm Beach, and the individual

---

[1] Langley Productions produces the television show "COPS."  A camera crew from the show was assigned to follow Officer Shaw on the night of October 19th, 2005, and created a video recording of the entire incident.  Although initially named as defendants, Langley Productions,

officers all filed the six instant motions for summary judgment [DE # 91, 94, 95, 96, 97, 98].

JURISDICTION

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the amended complaint [DE # 22] asserts a claim under 42 U.S.C. § 1983. This court has supplemental jurisdiction over plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a).

Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in the Southern District of Florida.

DISCUSSION

**A.      *Standard of Review on Motion for Summary Judgment***

Summary judgment is warranted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In determining whether summary judgment is appropriate, the facts and inferences from the record are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Matsuhita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87

---

Danny Jeffrey and Zach Ragsdale were dropped from the lawsuit on November 29, 2007. *See* DE # 163. Both parties nonetheless rely heavily on the video recording to establish the facts underlying their motions, and agree that the recording is a reliable and accurate representation of the disputed events.

4

(1986).

The non-moving party, however, bears the burden of coming forward with evidence of each essential element of his claims, such that a reasonable jury could return a verdict in his favor. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002). In response to a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on the basis of which a jury could reasonably find for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A complete failure of proof concerning an essential element of the non-movant's case necessarily renders all other facts immaterial and entitles the moving party to summary judgment. *See Celotex*, 477 U.S. at 323; *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998).

**B.    Motions for Summary Judgment**[2]

        *1.    Constitutional Claims*

Plaintiff's § 1983 claim against the City of West Palm Beach proceeds on the "failure to train" theory authorized by the Supreme Court in *City of Canton v. Harris*, 489 U.S. 378 (1989). Plaintiff's § 1983 claims against the individual officers must overcome the officers' defenses of qualified immunity. *See Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). The threshold question in both cases is whether Lewis' constitutional rights were violated. *See Saucier v. Katz*,

---

[2] Plaintiff moves for summary judgment only as to Count III, the § 1983 claim against the officers in their individual capacities. Defendants' motions for summary judgment address all counts.

533 U.S. 194, 201 (2001) (requiring courts to address the constitutional issue before the question of

qualified immunity).[3]  Thus, the court must first decide whether the police officers violated Lewis'

Fourth Amendment rights.

> a.      Fourth Amendment

The Fourth Amendment provides citizens with the right to be free from the use of excessive

force in the course of a lawful seizure.  *See Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir.

2004). Force is not excessive if the officer's actions, judged from the perspective of a reasonable

officer on the scene, were objectively reasonable in light of the facts and circumstances. *See Graham*

*v. Connor*, 490 U.S. 386, 396-97 (1989); *Beshers v. Harrison*, 495 F.3d 1260, 1266 (11th Cir. 2007);

*Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).   The question of whether force is

unreasonable, and therefore excessive, is a question of fact.  *See, e.g. Slicker v. Jackson*, 215 F.3d

1225, 1233 (11th Cir. 2000).  To determine the existence of genuine issues of material fact on the

reasonableness of force, courts must examine the need for the application of force, the relationship

between the need and amount of force used, and the extent of the injury inflicted.  *Draper*, 369 F.3d

at 1277-78.

Review of the videotape and other record evidence in this case reveals no genuine issue of

material fact concerning whether, for most of the incident, the officers applied reasonable force.

When Officer Shaw first arrived on the scene, Lewis was shirtless, hyperventilating and non-

responsive to Officer Shaw's inquiries.  Lewis was ranting and raving, panicked and inconsolable.

---

[3] The Supreme Court recently expressed doubts about *Saucier*'s "order of battle" rule, but simultaneously recognized its continued vitality.  *See Scott v. Harris*, 127 S.Ct. 1769, 1774 n.4 (2007); *id*. at 1780 (Breyer, J., concurring) (suggesting that the Court "can and should reconsider *Saucier*'s requirement").

Officer Shaw correctly perceived that Lewis was under the influence of cocaine, and was either unwilling or unable to comply with Officer Shaw's instructions or coherently answer Officer Shaw's questions. Lewis then ran into the path of oncoming traffic in the westbound lane of 45th Street. A reasonable officer in Officer Shaw's position clearly would have been concerned that Lewis posed a danger both to himself and to others nearby. Under these circumstances, it was reasonable for Officer Shaw to confront and attempt to restrain Lewis.

The video recording shows that when Officer Shaw caught up to Lewis, he first attempted to pull Lewis out of the street. When Officer Shaw made physical contact with Lewis, Lewis began to resist. Officer Shaw plainly acted reasonably in attempting to restrain Lewis, who was struggling and groaning bizarrely. The force used by Officers Shaw, Root and Luke in forcibly removing Lewis from the street was clearly reasonable, considering the dangers posed by possible traffic to Lewis, the officers, and passing motorists. Finally, the officers' application of a hobble to Lewis by the side of the road was also reasonable. By and large, the video shows that the officers were attempting to secure and restrain a man who was clearly intoxicated, in a dangerous state of panic and behaving extremely erratically. Since Officer Shaw initially confronted him, Lewis had consistently demonstrated that he would not respond to officers' queries or instructions, or to control his behavior in any reasonable way. The use of force by the officers was generally objectively reasonable under all the circumstances.

However, two specific aspects of the incident give rise to a genuine issue of material fact as to whether three of the officers named as defendants used excessive force. The first is the officers' repeated placement of their knees on Lewis' upper back or neck while Lewis was lying prone. This technique was first employed by Officer Root while assisting Officer Shaw in handcuffing Lewis

near the centerline of 45th Street. While the use of the technique may have been necessary in order to immobilize Lewis while he was being handcuffed by Officer Shaw, it served no purpose after Lewis was handcuffed. Yet Officer Root continued to forcefully depress his knee on the back of Lewis' neck for nearly one additional minute. During this time, Lewis squirmed and groaned as though in pain.

Once Lewis had been removed from the street, Officer Shaw placed his own knee on Lewis' upper back, although in this instance Lewis was turned partially to the side. Finally, while the officers bound Lewis in the hobbling device, Officer Root and Officer Luke appeared to both have their knees on Lewis' back. Here again, because Lewis' hands were cuffed behind his back and his feet already tied together, there appears to have been no reason for Officer Root and Officer Luke to employ such a painful and potentially dangerous technique. A reasonable juror, considering the particular way Officer Shaw, Officer Root and Officer Luke used this technique in this incident, could conclude that it constituted an excessive use of force under the circumstances.

Second, Officer Shaw took one particularly dangerous and unnecessary action by the side of the road. At one particular point while Lewis was handcuffed and lying face-down, Officer Root and Officer Luke had their knees on Lewis' back. While attempting to apply the hobble to Lewis' legs, Officer Shaw picked up Lewis' legs in an obviously unnatural and dangerous position and violently shoved them forward, placing tremendous stress on Lewis' spine and neck.[4] At just that moment, Lewis, who had been continuously groaning and writhing, suddenly became silent and motionless.

Whether the officers' treatment of Lewis could have caused Lewis' death is a matter of dispute between the parties. Defendants rely on the report of Dr. Michael Bell, the chief medical

---

[4] This occurs approximately six minutes and forty seconds into the video recording.

8

examiner for Palm Beach County.  Dr. Bell concluded that the cause of Lewis' death was "sudden respiratory arrest following physical struggling restraint due to cocaine-induced excited delirium." Bell Dep. at 7.  But Dr. Bell's explanation of that medical concept was not terribly satisfactory.  Dr. Bell described it as occurring most commonly where an individual who has been using cocaine and who has been restrained suddenly

> stop[s] fighting.  Then you think everything is fine and then you realize they're not breathing or they're unresponsive.  Then you do CPR and try to bring them back to life. . . . [If] they get to the hospital and resuscitation is prompt, they may survive or not . . . So again, it's like I said, a poorly understood phenomena . . . .  So there's still a lot more to learn about this, especially with regard to why do they die.  Why do they suddenly stop breathing?

*Id.* at 9-10.  This does not shed a tremendous amount of light on what caused Lewis' death. The general thrust of Dr. Bell's opinion seems to be that the combination of Lewis' cocaine use and his restraint by the police officers somehow caused Lewis to stop breathing.  Dr. Bell further testified that

> it's unclear to me to what degree the struggle and the, you know, the cocaine or whatever is going on in their mind, which has a greater affect [sic].  Clearly, I think you probably, at least most of the cases I see, you need both.  There's usually a struggle, and you got this person who is – you know, it's not just a cocaine user, but there's something that happened to them after they use cocaine that sets them apart from the other cocaine users that don't develop this syndrome . . . .
>
> You know, this isn't the only time it's ever happened.  It happened before and it will happen again.  It's not going to matter whether the police restrain them or what type of restraint device or mechanism – I don't know what the term is – that they use. It doesn't matter if they use tasers or they come up with a new device.
>
> There's something about the struggle, you know, whether that – that interacts and maybe just puts them over the edge to, you know, go into – at least in this case it appeared to be a respiratory arrest.  But it could be a cardiac arrest or a cardiopulmonary arrest.  Who the hell knows unless you got them all hooked up to the machines when this is all happening.

*Id.* at 11-13.  Finally, when asked directly if the restraint alone could have caused Lewis'

death, Dr. Bell testified:

> Well, if I thought the death was as a result of him being restrained, that's what I would have called it. The way I phrased it is, again, I think probably it shows that I can't completely rule it out, but at the same time that's what was happening at the time, you know, that he became unresponsive.
>
> So it's being honest in the sense that this is happening. He's being restrained and he suddenly becomes limp and unresponsive. I'm not sure that just restraining him was the cause of his death. If I did, I would have said that he died of either traumatic asphyxiation or suffocation or something like that. I think it's a lot more complex than that, and I think it starts with his excited delirium.

*Id.* at 14. The testimony of plaintiff's expert witness, Dr. Michael Baden, was also somewhat equivocal. Dr. Baden expressed skepticism about defendants' theory that Lewis' death was caused by "excited delirium." Dr. Baden testified that

> so-called excited delirium, sudden death due to cocaine is extremely rare and is used as an excuse often when people die during police restraint . . . . [I]n my experience in looking at excited delirium cases . . . invariably, the person would have died without the excited delirium. It's the physical forces that are involved that casue the death. And I just think that, in this case, that he did not die from excited delirium and that if he hadn't been restrained . . . he wouldn't have died.

Baden Dep. at 104. Dr. Baden testified that the cause of death was asphyxia caused by neck compression. *Id.* at 121. He also testified that the "critical" factor leading to Lewis' death was injury to Lewis' neck. *Id.* at 134-35. But Dr. Baden could not identify any of the officers' actions in particular that might have led to Lewis' death. *Id.* Dr. Baden also acknowledged that he could not tell from the evidence before him precisely when Lewis stopped breathing, or by what mechanism the officers' actions might have caused Lewis to stop breathing. *Id.* at 88-90.

Given the conflicting nature of the record evidence, particularly the testimony of the two experts, both the cause of Lewis' death and the role of the officers in it, if any, remains unclear. But in any event, regardless of whether the actions of the officers caused Lewis' death, a reasonable juror

could find that the officers used constitutionally excessive force under the circumstances. After Lewis was already handcuffed and effectively immobilized, there was simply no need for the officers to kneel on Lewis' upper back and neck. Nor was there a need for Officer Shaw to pick up and shove Lewis' legs down toward his awkwardly contorted body. The officers were attempting to either further restrain Lewis, or to place him in a seated position. Officer Shaw's actions, combined with Officer Root's and Officer Luke's knees on Lewis' back, did not help achieve either of these possible goals. Therefore, there is a genuine issue of material fact as to whether Officer Shaw, Officer Root, and Officer Luke violated Lewis' rights under the Fourth Amendment.

> b.     Qualified Immunity

The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Al-Amin v. Smith*, 511 F.3d 1317, 1324 (11th Cir. 2008) (internal quotations and citations omitted). The government official claiming the protection of qualified immunity must first establish that he was acting within his discretionary authority. *Id.* There is no dispute that all five officers in this case were acting within their discretionary authority.

The burden then shifts to the plaintiff, who must satisfy a two-part test in order to avoid the application of qualified immunity. First, the plaintiff must show that the allegations, if true, establish a constitutional violation. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). As noted *supra*, a reasonable juror could conclude that Officers Shaw, Root, and Luke used excessive force, and that Lewis' Fourth Amendment rights were thus violated. Therefore, this first part of the test has been satisfied.

11

Second, the plaintiff must show that the constitutional right was clearly established at the time of the alleged violation. *Al-Amin*, 511 F.3d at 1324-25. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The requirement that the constitutional right be "clearly established" has also been described as ensuring that the officers had "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Under the Eleventh Circuit's framework for applying this step of the qualified immunity analysis, a plaintiff must show that the allegedly violated right was "clearly established" in one of three ways. First, the plaintiff may show that a case with indistinguishable material facts has been decided in the Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the pertinent state, affirming the existence of the right and "clearly establishing" it for purposes of qualified immunity. *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007). Second, a broad statement of principle in case law can be sufficient under some circumstances to "clearly establish" conduct as unconstitutional. *Williams v. Consolidated City of Jacksonville*, 381 F.3d 1298, 1303 (11th Cir. 2004); *Marsh v. Butler County*, 268 F.3d 1014, 1032 n.9 (11th Cir. 2001) (en banc). Third, the plaintiff may show that the alleged conduct of the officials was so egregious that the rights violated were clearly established, even in the total absence of case law. *Vinyard*, 311 F.3d at 1350.

Plaintiff conceded at oral argument that there are no relevant cases with materially indistinguishable facts (or, for that matter, with facts even vaguely similar to the case at bar) holding that an officer's knee on a detainee's back, or the use of a hobble restraint, constitutes excessive force. The court's own research has likewise revealed none. Thus, plaintiff is unable to overcome

12

the officers' qualified immunity defense with the first method described above.

Plaintiff argues that the Eleventh Circuit's cases demonstrate a "broad principle" governing the limits of the use of non-lethal force, and that the principle is sufficient to clearly establish the constitutional rights allegedly violated by the officers.  In particular, plaintiff likens this case to *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), in which the Eleventh Circuit reversed a grant of summary judgment in favor of police officers whose use of so-called "less-lethal" force was alleged to have been excessive.

In *Mercado*, police officers were confronted with a distraught man holding a knife toward his own chest, threatening to kill himself.  One of the police officers in that case fired a supposedly non-lethal projectile at the man from nearly point-blank range.  The projectile hit the man in the head and killed him.  The Eleventh Circuit reversed the grant of summary judgment in favor of the officer who fired the projectile.

The *Mercado* court emphasized that the victim "was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was shot."  407 F.3d at 1157-58.  The confrontation in *Mercado* also apparently took place in the victim's own apartment.  *Id.* at 1154.  The same observations could not be made in this case.  Lewis actively resisted Officer Shaw's attempts to pull him off the road and to get Lewis' hands into a position where they could be handcuffed.  Through his erratic behavior, including wandering into and through 45th Street, Lewis also showed that he constituted a threat to himself and potentially to others nearby.

Moreover, the amount of force used here is less than that in *Mercado*.  In *Mercado*, the court noted that the officer "was aware that the [projectile launcher] was a lethal force if he shot at a subject from close range."  *Id.* at 1158.  By contrast, in this case there is no allegation or evidence

13

that Officer Shaw knew at any time that the force he used against Lewis could have led to his death. And though the Supreme Court has rejected a categorical distinction between deadly and non-deadly force, *see Scott v. Harris*, 127 S.Ct. 1769, 1777-78 (2007), the amount of force used in a particular case is obviously relevant to whether the use of force was reasonable.

When considered all together, the differences between *Mercado* and the instant case are too great for the court to conclude that any "broad principle" created or referenced in *Mercado* was enough to give the officers in this case fair warning that their conduct violated the Constitution. Unlike this case, *Mercado* involved force known to the officer to be lethal, and a victim located in his own apartment, rather than on the street. Whatever the precise contours of the broad principle that *Mercado* may fairly be said to represent, it does not control this case. Thus, *Mercado* is insufficient to clearly establish the right allegedly violated in this case.

Finally, plaintiff argues that the officers' conduct was so egregiously excessive that any reasonable officer would have understood it to be unconstitutional, even in the absence of any relevant case law. *See Willingham v. Loughnan*, 321 F.3d 1299, 1302 (11th Cir. 2003); *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002). The court disagrees.

This is precisely the kind of case in which the Eleventh Circuit has repeatedly cautioned district courts against second-guessing the decisions of police officers confronted with "circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397; *see also Beshers*, 495 F.3d at 1266 (citing *Graham*); *Robinson v. Arrugueta*, 415 F.3d 1252, 1255-56 (11th Cir. 2005); *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003) ("We are loath to second-guess the decisions made by police officers in the field."). The officers here were confronted by an agitated and uncooperative man with only a tenuous grasp on reality. Although the force used to restrain him

14

may have been constitutionally excessive, the court cannot say that it was so obviously unconstitutional that, even in the absence of relevant case law, qualified immunity is inappropriate.

Thus, because plaintiff has not met her burden to show that the allegedly violated right was clearly established, the officers in this case are entitled to qualified immunity. The court will therefore grant the officers' motions for summary judgment.

c.    Municipal Liability

Under § 1983, defendant City of West Palm Beach may be held liable for constitutional violations committed by its officers only if a municipal policy or custom is the moving force behind the violation. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978). A municipality's failure to adequately train its officers may constitute such a policy. *City of Canton v. Harris*, 489 U.S. 378 (1989). Here, the plaintiff appears to allege three separate failures to train: 1) lack of training on how to properly interact with mentally ill persons; 2) lack of training on proper use of hobble restraints; and 3) deficient training as to the proper placement of an arresting officer's knee on an arrestee's back.

A municipality can be liable under an inadequate-training theory only where the lack of training reflects "deliberate indifference to the rights of persons with whom the police come into contact." *Bruce v. Beary*, 498 F.3d 1232, 1248-49 (11th Cir. 2007) (quoting *Harris*). Deliberate indifference generally may be established in two ways. First, the city is said to be deliberately indifferent if it is aware of a pattern of constitutional violations by its officers, yet nevertheless fails to adequately train them. *See Mercado*, 407 F.3d at 1161; *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1116-1117 (11th Cir. 2005); *Riley v. Newton*, 94 F.3d 632, 638 (11th Cir. 1996). Second, even a single violation of federal rights may demonstrate a municipality's

15

deliberate indifference, if the need for more or different training is so obvious that the municipality's policymakers effectively must have known of it.  *See Board of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997) (quoting *Harris*); *Gold v. City of Miami*, 151 F.3d 1346, 1352 (11th Cir. 1998).

Plaintiff acknowledged that it has not presented any evidence that there were any prior incidents of excessive force used by West Palm Beach police officers that would have alerted the city to a need for additional training.  Instead, plaintiff relies on the second avenue to municipal liability described above.  Plaintiff's main argument is that the danger of constitutional violations from the city's failure to adequately train its officers in the proper use of hobble restraints was so obvious that the city should be deemed deliberately indifferent to the risk of those violations.

The court cannot agree.  Where the city is unaware of any pattern of constitutional violations, the plaintiff bears an extremely heavy burden to demonstrate the city's deliberate indifference.  The plaintiff must show that the city knew "to a moral certainty" that constitutional violations would occur in the absence of additional or revamped training.  *See Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1175 (11th Cir. 2001), *vacated on other grounds sub nom. Thomas v. Roberts*, 536 U.S. 953 (2002); *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1556 (11th Cir. 1989).  Any causal connection between deficiencies in the city's training programs and the alleged constitutional violation in this case is simply too remote.  No policymaking official could reasonably be said to have known – certainly not "to a moral certainty" – that without training specifically directed to the use of hobble restraints, or to the appropriate use of officer's knees in restraining a struggling person, the city's police officers were likely to commit constitutional violations.  Nor did the city's training policy with respect to confrontations with mentally ill persons reflect a conscious choice to ignore

a risk "so obvious" that the city should be deemed deliberately indifferent, even without having been aware of any past constitutional violations. *See Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir. 1995) (finding that claims that prison officials were inadequately trained to treat mentally ill inmates "do not fit within this category").

Plaintiff has thus not produced sufficient evidence showing that the city was deliberately indifferent to the risk of constitutional violations. The court will accordingly grant the city's motion for summary judgment as to plaintiff's § 1983 claim.

### 2. *Wrongful Death*

Plaintiff also asserts a state-law wrongful death claim against the city. Plaintiff argues that the city is liable for the alleged negligence of its employees, resulting in Lewis' death.[5]

Under Florida law, municipalities are generally immune from liability in tort. *See Trianon Park Condominium Ass'n v. City of Hialeah*, 468 So.2d 912, 917 (Fla. 1985); *Cauley v. City of Jacksonville*, 403 So.2d 379, 381-84 (Fla. 1981). However, Florida has partially waived this immunity by statute so that the city is liable "under circumstances in which the state or agency or subdivision,[6] if a private person, would be liable to the claimant, in accordance with the general laws of this state." *See* Fla. Stat. § 768.28(1).

When a municipality is sued in negligence, the court must first determine whether the facts alleged would subject a private person to liability under Florida law. *See Lewis v. City of St.*

---

[5] Although the city argues in its motion for summary judgment that it cannot be held liable for the negligent training of its police officers, plaintiff's claim appears to be that the city should be held liable for the negligent acts of its officers in the scope of their duty, not that the city was itself negligent in training or hiring the officers. *See* Pl.'s Am Compl. ¶ 47.

[6] In this context, "state or agency or subdivision" includes municipalities. *See, e.g., Baldwin v. City of Fort Lauderdale*, 961 So.2d 1015, 1015 (Fla. 4th DCA 2007).

*Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001) (citing *Kaisner v. Kolb*, 543 So.2d 732, 734 (Fla. 1989)).   In Florida, a private employer is liable for the negligent acts of an employee occurring within the scope and course of employment.   *See Fernandez v. Florida National College, Inc.*, 925 So.2d 1096, 1100 (Fla. 3d DCA 2006); *Burch v. Sun State Ford, Inc.*, 864 So.2d 466, 471 (Fla. 5th DCA 2004).

However, Florida law does not recognize a cause of action for the negligent use of force in making an arrest.   *See City of Miami v. Ross*, 695 So.2d 486, 487 (Fla. 3d DCA 1997) (concluding that "there is no such cause of action as 'negligent' use of excessive force"); *City of Miami v. Sanders*, 672 So.2d 46, 48 (Fla. 3d DCA 1996) ("[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort.").   The amended complaint in this case alleges that the officers' use of force was negligent, rather than intentionally excessive.   *See* Pl.'s Am. Compl. ¶ 47 (alleging the "grossly negligent conduct of [the officers]").   It therefore fails to state a legally cognizable claim as to the officers, and there is thus no basis for the city's vicarious liability.   Accordingly, the court will grant the city's motion for summary judgment as to plaintiff's wrongful death claim.

## CONCLUSION

From the record evidence, a reasonable juror could conclude that the officers used constitutionally excessive force in their confrontation with Lewis.   However, because plaintiff has not demonstrated that the allegedly-violated right was clearly established, the officers are entitled to qualified immunity and summary judgment on plaintiff's § 1983 claim.   Plaintiff has further failed to show that the City of West Palm Beach was deliberately indifferent to the risk of the alleged violations.   The city is therefore also entitled to summary judgment on the § 1983 claim.   Finally,

Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendants' Motions for Summary Judgment
Lewis v. City of West Palm Beach et al.
Case No. 06-81139-CIV-HURLEY/HOPKINS

because Florida law does not recognize a cause of action for a police officer's negligent use of force

in making an arrest, the city is entitled to summary judgment on plaintiff's wrongful death claim as

well.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1.      Plaintiff's motion for summary judgment [DE # 97] is **DENIED**.

2.      Defendants' motions for summary judgment [DE # 91, 94, 95, 96, 98] are

        **GRANTED**.

3.      Pursuant to Fed. R. Civ. P. 58(a), the court will enter final judgment by separate

        order.

4.      Any motions not otherwise ruled upon are **DENIED AS MOOT**.

5.      The Clerk of the Court is directed to enter this case as **CLOSED**.

**DONE** and **ORDERED** in Chambers in West Palm Beach, Florida, this 18th day of March,

2008.

                                                        Daniel T. K. Hurley
                                                        U.S. District Judge

*Copies provided to counsel of record*

For updated court information, visit unofficial Web site
at http://us.geocities.com/uscts